**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
        *Plaintiff-Appellee,*

v.

STACY HUNT,
        *Defendant-Appellant.*

No. 09-30334

D.C. No.
3:04-cr-00026-
RRB-1

OPINION

Appeal from the United States District Court
for the District of Alaska
Ralph R. Beistline, Chief District Judge, Presiding

Argued and Submitted
December 1, 2010—Seattle, Washington

Filed September 1, 2011

Before: Robert R. Beezer, Diarmuid F. O'Scannlain, and
Richard A. Paez, Circuit Judges.

Opinion by Judge Paez;
Dissent by Judge O'Scannlain

16649

**COUNSEL**

Allison E. Mendel, Mendel & Associates, Anchorage Alaska, for the appellant.

Andrea T. Steward, Assistant United States Attorney, Anchorage, Alaska, for the appellee.

**OPINION**

PAEZ, Circuit Judge:

The district court sentenced Appellant Stacy Hunt to 180 months in prison after he pled guilty to attempting to possess a controlled substance with the intent to distribute in violation of 21 U.S.C. §§ 841(a), 846. Hunt appeals his sentence but not his conviction. He alleges that the district court erred under *Apprendi v. New Jersey*, 530 U.S. 466 (2000), by sentencing him for attempted possession with intent to distribute an unspecified amount of cocaine even though he never admitted that he attempted to possess cocaine. We conclude that the district court erred under *Apprendi* and that the error was not harmless. Accordingly, we reverse and remand for resentencing.[1]

---

[1]Hunt also argues that the district court violated Federal Rule of Criminal Procedure 32, that the court committed procedural error in its fact-finding, and that his sentence was substantively unreasonable. Because we vacate the sentence and remand for resentencing due to the *Apprendi* error, we do not address Hunt's other arguments.

## I.  Background

Acting on a tip, police intercepted a suspicious Federal Express package at the airport in Anchorage, Alaska, on January 26, 2004. The police brought in a drug-sniffing dog that alerted to the package. After obtaining a search warrant, the police opened the package and discovered it contained approximately one kilogram of cocaine hidden in candles. The police removed most of the cocaine and resealed the package with a nominal amount of the drug inside.

A few days later, an undercover officer delivered the package to an apartment in Anchorage. A woman signed for the package, and police investigators conducting surveillance watched her put it in the trunk of a car. Sometime later, the investigators observed Stacy Hunt take the package from the car and carry it towards the apartment. Shortly thereafter, Hunt left in a white Ford Explorer driven by another man.

While several officers followed the Ford Explorer, others searched the apartment and spoke to the woman who signed for the package. She told police that she had agreed to receive the package for a man named "Sterling," who paid her approximately $400 for accepting delivery of three separate packages. She claimed she did not know what was inside the package.

The officers tailing the Explorer conducted a traffic stop and saw the Federal Express package inside the vehicle. They arrested the driver and Hunt, who carried Oregon identification with the name "Mario McCoy." The police interrogated the driver, who told them that he had driven Hunt, whom he knew as "Buddy Walker," to pick up a package on two occasions. He also told them that Hunt had given him five or six thousand dollars to deposit into a checking account in order to obtain a cashier's check.

With Hunt's counsel present, the police interviewed Hunt as well. Still using the name Mario McCoy, Hunt signed a

written statement detailing the drug transaction. Hunt wrote that he had ordered drugs from a person in California. He wrote that the person who received the package was supposed to be paid $400 and that a "package of 1 kilo of coke was to be put in a burgundy Mercedes S.U.V." parked outside a restaurant. Immediately below Hunt's statement, his lawyer wrote that Hunt would cooperate with the government if the government allowed the case to proceed in state court, rather than federal court. Hunt was released. His lawyer, however, lost contact with him.

On February 17, 2004, a federal grand jury indicted Hunt, alleging that he "did knowingly and intentionally attempt to possess with intent to distribute a controlled substance, to wit: 500 grams or more of a mixture and substance containing cocaine" in violation of 21 U.S.C. §§ 846, 841(b)(1)(A). On December 13, 2007, Hunt was arrested in California, and officers learned that he was the subject of a federal arrest warrant. Hunt was taken to Alaska to face the federal drug distribution charges.

Hunt ultimately decided to plead guilty without a plea agreement. At the change of plea hearing, there were several references to Hunt's attempt to possess cocaine. First, in response to the court's inquiry regarding the elements of the offense, the Assistant United States Attorney (AUSA) stated that the government would need to prove at trial that Hunt "attempted to possess a parcel that contained a little over a kilogram of cocaine . . . and that he did so knowingly." Hunt stated that he understood those elements. After a few moments passed, the AUSA stated that he forgot to include the element that "Mr. Hunt attempted to possess that cocaine with the intent to distribute it thereafter." Hunt responded that he understood that additional element.

The court then restated the elements of the offense as follows: "So you attempted to possess cocaine, you knew it was cocaine *or some illegal drug*, and you did it with the intent to

distribute. I guess those are the three elements, okay?" (emphasis added). Hunt replied, "To those elements, yes, I agree." Hunt then asked that the government state the elements one last time. The AUSA responded that the government would have to prove that "Mr. Hunt attempted to possess a parcel which contained a little over a kilogram of cocaine [and] . . . [w]e'd have to prove that Mr. Hunt's attempt to possess that cocaine was done knowingly and then we'd have to prove that he intended to distribute that cocaine after coming into possession of it." Hunt replied, "Yes I understand those elements. As far as the specific amount, I don't have personal knowledge of it . . . as I never opened the package and weighed it, but I do accept responsibility for whatever it was."

After the government stated the facts it expected to prove if the case were to proceed to trial—including that Hunt was found in possession of a package of over 500 grams of cocaine and later admitted that he had ordered the drugs in a written statement—Hunt said, "For the most part, the facts are true. I admit all the elements of 841(a)(1), and also as I said, I did not receive the package and open it, so I have no specific knowledge of what it contained other than it did contain a controlled substance, that I do know, and I did attempt to possess that controlled substance." Hunt also confirmed that he had intended to sell or give away the controlled substance. The court then asked the government, "That sounds sufficient, doesn't it, counsel?" The AUSA agreed that Hunt's admission was sufficient to supply a factual basis for the offense, and the court accepted Hunt's plea.

Hunt's sentencing hearing stretched out over a number of months because of several controversies. First, Hunt argued that he should not be sentenced under 21 U.S.C. § 841(b)(1)(A), the penalty provision for possession with intent to distribute more than 500 grams of cocaine, because he did not admit to a specific amount of drugs during the change of plea hearing. After both parties filed several com-

peting motions on the issue, the court decided, "in an abun-
dance of caution, giving defendant every benefit of the
doubt," that it would accept Hunt's argument and sentence
him as if he had attempted to possess an unspecified amount
of cocaine under 21 U.S.C. § 841(b)(1)(C).

In the sentencing memoranda contesting the applicability of
section 841(b)(1)(A), Hunt never raised the issue of whether
he had admitted at the plea colloquy that he attempted to pos-
sess cocaine. When the court heard oral argument on Hunt's
objections to the presentence report at the initial sentencing
hearing, however, Hunt expressly denied that he had admitted
to attempting to possess cocaine when he and the court
engaged in the following exchange:

> HUNT: Also, when I made my objections, which
> has been overlooked, I also objected on the
> grounds that I did not at plea colloquy
> admit to a specific type of controlled sub-
> stance, and I only agreed that I attempted
> to possess a controlled substance.
>
> THE COURT: Right.
>
> HUNT: Not crack, cocaine, or marijuana, or any-
> thing like that. I only agree to a Schedule
> II — not even a Schedule II. I only agree
> to a controlled substance. So are you also
> making a finding for the type of drug also?
>
> THE COURT: Yes, okay.
>
> HUNT: So I'd like to make sure that my (indis-
> cernible) objection is in for not just quan-
> tity but also as to type of drugs. And my
> position is that I should fall back to mari-
> juana for no remuneration, with a statutory
> max of five years, up — under (b)(1)(D).

THE COURT: Very well. Boy, you're smart. You've made your record, but I — you haven't changed my mind.

HUNT: Okay, that's fine.

At a subsequent sentencing hearing, the government called Detective Elizer Feliciano of the Anchorage Police Department. Detective Feliciano was present when Hunt signed the statement in which he admitted to ordering and receiving drugs from California. Through the detective's testimony, the government introduced a Drug Enforcement Agency laboratory report showing that the substance in the Federal Express package was 1,102 grams of a mixture containing cocaine. Further analysis showed that the mixture was 72 percent pure cocaine.

The detective testified that, in his training and experience, a person receiving a large quantity of cocaine, such as a kilogram, would specify the amount he wished to purchase and would agree on a price with the seller. He estimated that the cocaine Hunt received was worth approximately $25,000.

On cross-examination, Detective Feliciano testified that the type and amount of drugs contained in the Federal Express package were known to the police before Hunt gave his statement, and that the police likely communicated this information to Hunt's attorney before the interview took place. He also confirmed that the interview occurred after Hunt and the government had entered into a cooperation agreement contingent upon Hunt's ability to provide reliable information.

On the basis of Detective Feliciano's testimony, the court found that Hunt was responsible for more than 500 grams of cocaine for the purpose of calculating Hunt's applicable advisory sentencing guidelines range. Pursuant to the United States Sentencing Guidelines § 2D1.1(c)(7), the court determined that Hunt's base offense level was 26. To this level, the

court applied a two point enhancement for obstruction of justice as a result of Hunt absconding after his arrest, *see id.* at § 3C1.1, and a two point reduction for acceptance of responsibility, *see id.* at § 3E1.1(a), resulting in a final offense level of 26.

Next, the parties agreed that Hunt's criminal history score was a Category IV. Based on Hunt's lengthy criminal history, the court departed upward to a criminal history score of VI, which yielded an advisory guidelines range of 120 to 150 months. After considering the 18 U.S.C. § 3553(a) sentencing factors, the court determined that a further upward variance was warranted. The court ultimately sentenced Hunt to 180 months, or 15 years, in prison.

## II.    Standard of Review

We review de novo a claim that a sentence violates a defendant's constitutional rights. *United States v. Raygosa-Esparza*, 566 F.3d 852, 854 (9th Cir. 2009). *Apprendi* errors are reviewed under the harmless error standard applied in *Neder v. United States*, 527 U.S. 1 (1999). *See United States v. Zepeda-Martinez*, 470 F.3d 909, 913 (9th Cir. 2006) (holding that error under *Apprendi* is harmless if the court finds beyond a reasonable doubt that the result would have been the same absent the error).

## III.    Discussion

### A.   *Apprendi* Error

**[1]** "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490. In *United States v. Buckland*, we explained that "[w]e honor the intent of Congress and the requirements of due process by treating drug quantity *and type*, which fix the maximum sen-

tence for a conviction, as we would any other material fact in a criminal prosecution: it must be charged in the indictment, submitted to the jury, subject to the rules of evidence, and proved beyond a reasonable doubt." 289 F.3d 558, 568 (9th Cir. 2002) (en banc) (emphasis added); *see also United States v. Thomas*, 355 F.3d 1191, 1195 (9th Cir. 2004) ("[D]rug type and quantity . . . are material facts that must be submitted to the jury and proved beyond a reasonable doubt.").

**[2]** When a conviction is obtained through a guilty plea rather than a jury verdict, "[t]he government has the burden 'at the plea colloquy to seek an explicit admission of any unlawful conduct it seeks to attribute to the defendant.' " *Thomas*, 355 F.3d at 1199 (quoting *United States v. Cazares*, 121 F.3d 1241, 1248 (9th Cir. 1997)). A guilty plea constitutes an admission to the formal elements of an offense. *See Cazares*, 121 F.3d at 1246 (citing *McCarthy v. United States*, 394 U.S. 459, 466 (1969)). We have held, however, that drug quantity and type are not formal elements of the offenses set out in 21 U.S.C. § 841. *Thomas*, 355 F.3d at 1195. Therefore, even though due process requires that drug type be charged in the indictment and proved beyond a reasonable doubt, a defendant can plead guilty to 21 U.S.C. § 841(a)[2] without admitting the type of drug. *See id.* at 1198.

Here, Hunt purportedly pled guilty to *attempted* possession with the intent to distribute a controlled substance in violation

---

[2]21 U.S.C. § 841(a) reads:

  (a) Unlawful acts

    Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—

      (1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance; or

      (2) to create, distribute, or dispense, or possess with intent to distribute or dispense, a counterfeit substance.

of 21 U.S.C. §§ 841(a) and 846. The elements of the offense are (1) that the defendant intended to possess a controlled substance with the intent to distribute it to another person, and (2) that the defendant did something that was a substantial step toward committing the crime. *See* Ninth Cir. Model Jury Instr. 9.17. Hunt expressly admitted that he intended to possess a controlled substance and that he intended to distribute the controlled substance, and he does not appeal his conviction for this generic offense.

In light of the colloquy at the change of plea hearing, however, we conclude that Hunt did not admit that he intended to possess an unspecified amount of cocaine under section 841(b)(1)(C). We note first that Hunt was informed of incorrect and inconsistent statements of the elements of the offense and the heightened sentencing provisions for drug type. The government erroneously stated twice that it was required to prove beyond a reasonable doubt that Hunt "knowingly" attempted to possess cocaine. While knowing possession is an element of the completed offense of possession with intent to distribute, Ninth Cir. Model Jury Instr. 9.15; *see*, *e.g.*, *United States v. Orduno-Aguilera*, 183 F.3d 1138, 1140 (9th Cir. 1999), attempted possession requires *proof of intent*, not knowledge. The district court correctly informed Hunt that the government needed to prove that he intended to possess cocaine, but incorrectly stated that the government could meet its burden by proving that Hunt intended to possess cocaine "or some other controlled substance."

**[3]** Nowhere in the record did either the government or the court inform Hunt that a conviction for attempted possession with intent to distribute cocaine under section 841(b) requires proof beyond a reasonable doubt that the defendant intended to possess cocaine. Quick reference to the Ninth Circuit's model jury instructions would likely have avoided this error. Jury Instruction 9.17 plainly emphasizes drug type in the first element of the offense when it states that the government must prove that "the defendant intended to possess [*specify*

*controlled substance*] . . ." (emphasis in original). At Hunt's change of plea hearing, however, neither the government nor the court ever unequivocally informed Hunt that the government would be required to prove that Hunt intended to possess cocaine in addition to the other elements of the offense.

[4] Notably, after the government summarized the facts that it intended to prove if the case were to proceed to trial, Hunt expressly denied knowledge of the contents of the package and stated that he did not know what it contained because he never opened it and looked inside. Hunt informed the court that he admitted only the elements of 21 U.S.C. § 841(a), which conspicuously does not specify the type (or amount) of controlled substance. In short, at no time during the plea colloquy did Hunt expressly admit to facts that would establish that the drug he attempted to possess was cocaine.

[5] Because Hunt did not admit that he attempted to possess cocaine, and because the government did not prove that fact to a jury beyond a reasonable doubt, that fact could not be used to support an increase in the maximum statutory sentence Hunt faced. Section 841(b) contains numerous penalty provisions that correspond to various types and amounts of drugs. The penalties range from a maximum of one year in prison to a maximum of life in prison. *See*, *e.g.*, 18 U.S.C. § 841(b)(3) (maximum of one year for schedule V substance); § 841 (b)(1)(D) (maximum of five years for less than 50 kilograms of marijuana); § 841(b)(1)(B) (maximum of 40 years for more than 500 grams of cocaine or a maximum of life in prison where death or serious injury results from the use of the drug). The district court sentenced Hunt under section 841(b)(1)(C) for possession with intent to distribute an unspecified amount of cocaine, exposing Hunt to a maximum sentence of 20 years in prison. The district court erred under *Apprendi* in sentencing Hunt under section 841(b)(1)(C) because his maximum penalty increased from one year to 20 years in prison based on a fact—Hunt's possession of cocaine

—that Hunt never admitted and the government never proved beyond a reasonable doubt to a jury.

### B. Harmless Error

**[6]** Our finding of constitutional error does not end our inquiry, however, because we must review *Apprendi* errors for harmlessness. *See United States v. Zepeda-Martinez*, 470 F.3d 909, 913 (9th Cir. 2006). In assessing harmlessness, we review the entire record to assist us in determining what evidence the parties would have presented had the drug-type issue been fully litigated at a jury trial. *Id*. at 913, n.3. The record is therefore a guide to determining what the evidence would have established if the case had proceeded to trial; it is not a substitute for a trial, and there need only be evidence sufficient to support a contrary finding to show that the error was not harmless. *See Neder*, 527 U.S. at 19. Thus, an *Apprendi* error is harmless only "where the record contains 'overwhelming' and 'uncontroverted' evidence supporting an element of the crime." *Id.* (quoting *Neder*, 527 U.S. at 17-18). An *Apprendi* error is not harmless if " 'the defendant contested the omitted element and raised evidence sufficient to support a contrary finding.' " *Id.* (quoting *Neder*, 527 U.S. at 19).

Here, in arguing that the *Apprendi* error was harmless, the government relies principally on our decision in *United States v. Zepeda-Martinez*, 470 F.3d 909 (9th Cir. 2006). In *Zepeda-Martinez*, we held that an *Apprendi* error was harmless upon reviewing the sentence of a defendant who was convicted of being a removed alien found in the United States in violation of 8 U.S.C. § 1326. *Id*. at 912-13. In that case, Zepeda-Martinez was subjected to an enhanced sentence because at sentencing the court found that he had been removed from the United States after having committed a crime of violence. *Id*. at 911. The court based its finding on a California record of conviction dated May 21, 2002, and a warrant of removal showing that Zepeda-Martinez was ordered removed on June

8, 2004. *Id*. at 912. We concluded that the district court erred under *Apprendi* by basing the sentence in part on the date of the prior removal, a fact which was never admitted by Zepeda-Martinez during his guilty plea nor proven to a jury beyond a reasonable doubt. *Id.* at 912-13.

We held that the *Apprendi* error was harmless, however, because the record at sentencing contained overwhelming evidence of the date of the prior removal. *Id*. at 913. The government introduced the warrant of removal, an official government document which bore Zepeda-Martinez's name, signature and fingerprint as well as the name, title and signature of the immigration officer who witnessed the removal. *Id.* Significantly, Zepeda-Martinez did not contest the presentence report's allegation that he had been removed in 2004 nor the authenticity of the warrant of removal. *Id.; see also United States v. Hollis*, 490 F.3d 1149, 1157 (9th Cir. 2007) (holding that *Apprendi* error was harmless where several witnesses testified at trial without contradiction that defendant had possessed and sold crack cocaine and defendant did not contest the evidence of drug type at trial, in his objections to the presentence report, or at sentencing). We were thus "satisfied beyond a reasonable doubt that . . . the result 'would have been the same absent the [*Apprendi*] error.' " *Zepeda-Martinez*, 470 F.3d at 913 (quoting *Neder*, 527 U.S. at 19).

Hunt's case contrasts sharply with *Zepeda-Martinez*. Here, the record does not contain overwhelming evidence that Hunt attempted to possess cocaine. First, the contested fact in this case is Hunt's intent, a fact that is not subject to easy proof like the date of prior removal in *Zepeda-Marinez*, a fact which was proved through uncontroverted documentary evidence. Here, the government presented no evidence that Hunt looked inside the package to verify its contents, and neither the circumstantial evidence surrounding the offense nor Detective Feliciano's opinions convince us beyond a reasonable doubt that a jury would have found Hunt intended to receive cocaine.[3]

---

[3]We do not hold, as the dissent suggests, that circumstantial evidence is not sufficient to prove intent. We conclude only that the circumstantial

*See Neder*, 527 U.S. at 18 ("Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?").

The government's strongest evidence is undoubtedly Hunt's post-arrest signed statement where he wrote "package of 1 kilo of coke was to be put in burgundy Mercedes S.U.V." At the evidentiary hearing, however, Hunt presented non-frivolous arguments contesting the reliability of the statement. After Detective Feliciano conceded that information regarding the drug delivery was likely passed on to Hunt's attorney in preparation for Hunt's interview with the police, Hunt argued that he only learned of the contents of the package through his lawyer. Hunt also stated that he signed the statement only in exchange for a cooperation agreement with the government and that the signed statement reflected an affirmation of what the police wanted to hear, not his personal knowledge. On this record, we conclude that the evidence is not so overwhelming that a jury would necessarily find beyond a reasonable doubt that Hunt intended to possess cocaine.

**[7]** We also conclude that the constitutional error in this case was not harmless because Hunt, unlike the defendant in *Zepeda-Martinez*, expressly contested the facts at issue and pointed to "evidence sufficient to support a contrary finding" *Neder*, 527 U.S. at 19. Although the Supreme Court in *Neder* did not expressly define what quantum of evidence is "sufficient to support a contrary finding," in light of the available record evidence, Hunt's denial of his intent in this case meets

_____

evidence on the record in this case is insufficient for the government to meet its burden upon harmless error review, even when coupled with Detective Feliciano's opinions on the drug trade and Hunt's signed statement. This reflects our assessment of the weight of the evidence, not a criticism of the inherent quality of circumstantial evidence. Although we recognize that the government's evidence *could* convince a jury of Hunt's guilt, we are not convinced beyond a reasonable doubt that a jury would do so. *See Neder*, 527 U.S. at 18.

that standard. Here, as noted above, Hunt denied knowledge of the type of drug in the package twice—once at the change of plea hearing and a second time at a sentencing hearing. He also contested the reliability of the signed statement and the opinions of Detective Feliciano. If Hunt were to testify at trial consistent with these facts, his testimony, if credited, would raise a reasonable doubt as to his intent. We cannot conclude beyond a reasonable doubt that a rational jury would not find Hunt credible, especially where Hunt has never had the opportunity to testify.

Moreover, Hunt had no reason to continue litigating the drug-type issue during the course of the several sentencing hearings because the court had ruled at the initial sentencing hearing that Hunt had admitted to attempting to possess cocaine at the change of plea hearing. We faced a similar situation in *United States v. Jordan*, where a defendant was sentenced based on a court's finding of drug quantity that was neither alleged in the indictment nor submitted to the jury. 291 F.3d 1091 (9th Cir. 2002). In concluding that there was error under *Apprendi* that was not harmless, we said:

> because Jordan had no notice from the indictment that quantity would be an issue at trial, we would need to determine whether Jordan might have contested quantity and what evidence Jordan might have presented. Finally, to affirm the sentence, we would need to be able to say beyond any reasonable doubt that a jury, considering the actual evidence at trial and perhaps other evidence that was never presented, would have convicted Jordan of the higher-quantity offense.
>
> . . .
>
> Here . . . there are too many unknowns to be able to say with any confidence, let alone beyond reasonable doubt, that the error was harmless. What evidence

might have been proffered by Jordan, in a defensive effort to minimize quantity, if the indictment had properly charged the quantity involved in the offense, is entirely speculative.

*Id.* at 1096-97. Similarly, the plea and sentencing proceedings in this case provide an inadequate record because Hunt's intent regarding drug type was never litigated. Harmless error review of *Apprendi* errors requires us to " 'determin[e] what evidence [the parties] would have introduced at trial' had the issue been properly presented." *Zepeda-Martinez*, 470 F.3d at 914, n.3 (quoting *United States v. Nordby*, 225 F.3d 1053, 1061 n. 6 (9th Cir.2000), *overruled on other grounds by United States v. Buckland*, 289 F.3d at 568). On the record before us, it is speculative at best to predict what evidence the parties would have presented at trial relevant to Hunt's intent to possess cocaine.

If Hunt's case had proceeded to trial, he could have raised Sixth Amendment or evidentiary objections, he could have presented expert testimony to counter the opinions of Detective Feliciano, he could have cross-examined the various civilian and government witnesses called by the government, and he could have decided to testify to tell his side of the story. Most importantly, a jury would have evaluated and weighed the conflicting evidence. In contrast, we have before us on appeal a presentence report, a few documents admitted at the sentencing hearing, and a cold transcript of one detective's testimony. Given the limited record in this case, we decline to speculate on how a hypothetical trial may have unfolded because "we cannot reasonably conclude that these issues can be answered fairly based on reason and the record presented." *Jordan*, 291 F.3d at 1096.

**[8]** Accordingly, because Hunt contested the fact that the drug he intended to possess was cocaine and because the record evidence is far from overwhelming, we conclude that the *Apprendi* error in this case was not harmless.

## IV.    Conclusion

**[9]** Due to the *Apprendi* error, we are required to vacate Hunt's sentence and remand for resentencing. We recognize that our ruling will result in a substantial reduction in Hunt's sentence. On remand, the district court must resentence Hunt within the statutory range applicable given the facts that were admitted at the original change of plea hearing. *See Thomas*, 355 F.3d at 1201-02. Without an admission to the type of drug involved in the offense or a waiver of his rights under *Buckland* and *Apprendi*, Hunt faces a maximum of one year in prison under 21 U.S.C. § 841(b)(3), the least severe maximum sentence under section 841(b). *See Thomas*, 355 F.3d at 1201-02; *compare* 21 U.S.C. § 841(b)(1)(C) (unspecified amount of schedule I or II substance), *with* 21 U.S.C. § 841(b)(3) (schedule V substance).

The dissent complains that this result is unjust because it allows a criminal to "escape a richly deserved sentence based on an irrelevant technicality." The requirement that the government prove facts supporting a greater sentence beyond a reasonable doubt, or that the defendant admit such facts, however, is not an irrelevant technicality. The Supreme Court has explained that this requirement involves "constitutional protections of surpassing importance." *Apprendi*, 530 U.S. 476; *see also In re Winship*, 397 U.S. 358, 364 (1970) ("It is . . . important in our free society that every individual going about his ordinary affairs have confidence that his government cannot adjudge him guilty of a criminal offense without convincing a proper factfinder of his guilt with utmost certainty."). A sentence cannot be "richly deserved" under our Constitution if the facts supporting the sentence have not been proven as constitutionally required.

The result we announce could easily have been avoided had the district court or the prosecutor been more precise during the plea colloquy in obtaining Hunt's explicit admission to the type of drug he intended to possess and distribute. This is not

an arduous task, and when a defendant equivocates or refuses to admit an essential fact supporting a sentence, the district court can reject the defendant's plea and proceed to trial. Avoiding what the dissent calls a "windfall" sentence reduction due to an *Apprendi* error is achieved through a court's faithful compliance with constitutional requirements, not through appellate review. We are aware that Hunt has a less than stellar criminal record, but we reject the dissent's implicit suggestion that Hunt's criminal record should somehow influence our harmless error analysis. Our responsibility is to see that constitutional requirements are met. When they are not and the constitutional error is not harmless beyond a reasonable doubt, a sentence cannot stand.

VACATED and REMANDED for resentencing consistent with this opinion.

---

O'SCANNLAIN, Circuit Judge, dissenting:

The court orders Hunt's sentence effectively reduced from fifteen years to time served because the trial judge who took his guilty plea failed to seek an explicit admission that Hunt knew that the illegal drug he ordered, picked up, and possessed was cocaine. In my view, this error was harmless in light of the overwhelming and uncontroverted evidence that Hunt knew exactly what he was doing.

The majority does not really dispute this. Instead, it promulgates a new rule for this circuit, essentially eliminating harmless error review of *Apprendi* violations. Because of such unwarranted change in our sentencing jurisprudence, I must respectfully dissent.

# I

## A

In January 2004, the Anchorage Police Department received information that a man named "Stacy" was trafficking cocaine into Alaska by hiding it in candles. Later, law enforcement officers intercepted a package at the Anchorage airport which contained 1.2 kilograms of cocaine hidden inside candles. A controlled delivery was executed at the address listed on the package. A woman signed for the package and put it in the trunk of a car. Police then saw the defendant, Stacy Hunt, remove the package from the trunk of the car and leave with it in a Ford Explorer. The police stopped the Explorer, seized the cocaine, and arrested Hunt.

Hunt admitted to police that he ordered the cocaine and paid the woman $400 to sign for the package and to leave it for him in the trunk of the car. He then wrote a confession with his own hand stating that "Kisha called me . . . to pick up [the] package," "my understanding is that Kisha would be paid $400," and a "package of 1 Kilo of coke was to be put in burgundy Mercedes S.U.V."

## B

A federal indictment alleged that Hunt "knowingly and intentionally attempt[ed] to possess with intent to distribute a controlled substance, to wit: 500 grams or more of a mixture and substance containing cocaine," in violation of 21 U.S.C. §§ 841(b)(1)(B) and 846. Hunt appeared in federal court to plead guilty to the sole count in the indictment. The judge asked the Assistant United States Attorney (AUSA) to state the elements of the crime to which Hunt was pleading guilty. The AUSA stated that "the elements would be that on or about January 26th of 2004, Mr. Hunt attempted to possess a parcel that contained a little over a kilogram of cocaine . . . and that he did so knowingly." The court then asked Hunt if

he understood what the government would have to prove in order to obtain a conviction, and Hunt said, "Yes." "And you've discussed all this with your attorney?" the court asked. Again, Hunt said, "Yes." The AUSA then interrupted, noting that he forgot an element, namely, "that Mr. Hunt attempted to possess that cocaine with the intent to distribute it." "Do you understand that additional element?" asked the court. Again, Hunt replied, "Yes, I do."

At this point, the court added a casual phrase in a simple follow up question which, as it turns out, effectively knocks fourteen years off Hunt's sentence. The judge said: "So you attempted to possess cocaine, you knew it was cocaine *or some illegal drug*, and you did it with the intent to distribute. I guess those are the three elements, okay?" (emphasis added). Hunt responded, "[T]o those elements, yes, I agree." Hunt then asked, "Could you give me those elements once again?" The court directed the AUSA to state the elements again, and he said "that Mr. Hunt attempted to possess a parcel which contained a little over a kilogram of cocaine . . . . We'd have to prove that Mr. Hunt's attempt to possess that cocaine was done knowingly and then we'd have to prove that he intended to distribute that cocaine." "Got it?" the court asked. "Okay, yes," replied Hunt. "Yes, I understand those elements," Hunt continued, "As far as the specific amount, I don't have personal knowledge of it as I never opened the package and weighed it, but I do accept responsibility for whatever was in it." Deeming this sufficient, the court accepted Hunt's guilty plea.

C

The district court sentenced Hunt for attempting to possess an unspecified amount of cocaine, pursuant to 21 U.S.C. § 841(b)(1)(B), which carries a statutory maximum of twenty years' imprisonment. The district court determined the base offense level was twenty-six and departed upward from a criminal history category of IV to one of VI to reach a Guide-

lines range of 120 to 150 months. The court then imposed an above-guidelines sentence of 180 months. Both the upgrade in the defendant's criminal history category and the upward departure in reaching the ultimate sentence of fifteen years were driven by Hunt's extensive criminal history. As the district court put it, Hunt has led a life "consumed with criminal activity."

This was no exaggeration. In 1984, when Hunt was just seventeen, he attacked a woman on the street, dragged her into a stairwell, and attempted to rape her. The police found Hunt exposed and on top of the woman, who was crying and pleading with him to stop. Hunt's punches left her with a bleeding mouth, a bruised face, and scratches on her neck. To avoid responsibility, Hunt told the police that the woman was a prostitute and was attempting to rob him. Hunt was convicted of attempted rape but, due to his age, received no jail time. Four years later, Hunt was arrested for sexual assault again. This time, he was accused of kidnapping a woman outside her home at gunpoint, forcing her into his car, driving her to a park, and raping her. Hunt's defense, again, was that the woman was a prostitute. *No charges were filed.*

A month later, in October 1988, Hunt, along with four others claiming to be members of "the Disciples," severely beat and threatened to kill a man who had refused to give them the case of beer he was carrying. Although Hunt was arrested for robbery, the case was dismissed, in part because the victim could no longer be located. In 1989, Hunt was convicted of selling cocaine, for which he received a one-year sentence.

In 1991, Hunt participated in the kidnapping and murder of a rival drug dealer. Hunt claimed that his co-defendants forced him to participate in the killing, a story which prosecutors apparently believed because they arranged for him to receive a three-year sentence, suspended for twelve months, in exchange for his cooperation. In 1993, Hunt was again convicted of drug possession, jailed for ninety days, and put on

probation for three years, which he violated, causing him to serve ninety more days. Within a year of his release, Hunt violated his probation once again, this time by firing a gun in a nightclub in May 1994. Hunt was sentenced to two years in jail when he was finally convicted of this crime, after failing to appear in the original proceedings.

Just eight days after the nightclub incident, in June 1994, Hunt committed "battery with serious injury and a deadly weapon," by brutally beating his ex-girlfriend with a wooden baby cradle, and leaving her with a number of injuries, including a gash that required twenty stitches to close. He was sentenced to six years in prison. (At the same time, he was also charged with kidnapping, sexual battery, and forced oral sex, but not convicted.) Hunt went to jail for these crimes in 1996, but he was released on parole after two years, only to violate his parole three months later by testing positive for cocaine. He was arrested for another parole violation in 1999 and sentenced to six more months in jail. He violated parole once again in February 2000, for which he was not arrested until 2007.

Hunt was arrested on the current charges in 2004, but absconded to California after being released from police custody. It was not until December 2007, when he was arrested in California for beating up another women, that Hunt was finally returned to Alaska to face charges in the instant case.

Based on this vicious criminal history, the district court determined that a fifteen year sentence was necessary to "protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(C). The court added that, while Hunt's intelligence and charisma may have enabled him to avoid taking significant responsibility for his actions in the past, it would not do so this time.

## II

The majority correctly recites the *Apprendi* rule: "Other than the fact of a prior conviction, any fact that increases the

penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt," *Apprendi v, New Jersey*, 530 U.S. 466, 490 (2000), but goes astray thereafter. Assuming arguendo that the district court committed *Apprendi* error by finding intentional cocaine possession yet failing to obtain an explicit admission from Hunt that he knew the illegal drug he possessed was cocaine, our precedent requires us to determine whether such error was harmless. *See United States v. Zepeda-Martinez*, 470 F.3d 909, 910 (9th Cir. 2006) ("*Apprendi* errors are reviewed for harmlessness."). "[A]n error is harmless if the court finds beyond a reasonable doubt that the result 'would have been the same absent the error.' " *Id.* at 913 (quoting *Neder v. United States*, 527 U.S. 1, 19 (1999)). The court may make such a finding where "the record contains 'overwhelming' and 'uncontroverted' evidence supporting" the omitted element. *Id.* (quoting *Neder*, 527 U.S. at 17-18). Conversely, the error is not harmless if "the defendant contested the omitted element and raised evidence sufficient to support a contrary finding." *Neder*, 527 U.S. at 19. Where a court must determine whether an *Apprendi* error was harmless, its review "encompasses the whole record including the sentencing proceedings." *Zepeda-Martinez*, 470 F.3d at 913 n.3 (internal quotation marks omitted). The purpose of this broad review is "to assist [the court] in determining what evidence the parties would have introduced at trial." *Id.* (internal quotation marks omitted). Thus, if we conclude, beyond a reasonable doubt on the basis of the record, that a jury would have convicted Hunt of attempted possession of cocaine with intent to distribute, the *Apprendi* error is harmless and we must affirm.

## A

Here, the record contains overwhelming and uncontroverted evidence that Hunt attempted to possess cocaine with the intent to distribute it. The police received a tip that a man named "Stacy" was importing cocaine into Alaska, hidden in candles. Later, they intercepted a package that arrived in

Alaska containing just over a kilogram of cocaine hidden in candles. The police then executed a controlled delivery of the package at its intended address. Sure enough, the defendant—who, as predicted, is "a man named 'Stacy' "—retrieved the package hours after it was delivered.[1]

If this were not enough to convince a jury that Hunt intended to possess cocaine, Hunt confessed as much to the police. Hunt admitted that he ordered the cocaine and paid a woman named Kisha $400 to sign for the package and leave it for him in the trunk of the car. He then wrote a confession with his own hand stating that "Kisha called me to pick up [the] package" and that his "understanding is that Kisha would be paid $400," and that "package of 1 Kilo of coke was to be put in burgundy Mercedes S.U.V." Hunt's confession correctly recounted the amount of cocaine contained in the package (roughly a kilogram) and how the cocaine ended up in the trunk of the car: it was delivered to Kisha who signed for it, placed it in the car, and called Hunt to tell him it was ready for pick-up. This evidence of Hunt's intent to possess cocaine is surely "overwhelming." *Zepeda-Martinez*, 470 F.3d at 913.

---

[1]The majority calls this evidence "circumstantial" and faults the government for not offering evidence that Hunt "looked inside the package to verify its contents." Maj. Op. at 16663. This is an outrageous burden to place on the government, and one which is inconsistent with our long-standing rule that "circumstantial evidence can be used to prove any fact," *United States v. Ramirez-Rodriquez*, 552 F.2d 883, 884 (9th Cir. 1977), and is no less inherently probative than is direct evidence, *Ninth Circuit Model Criminal Jury Instructions* § 1.5 (2010). Moreover, intent is almost always proven circumstantially since the only direct evidence of intent is a confession (which, incidentally, the government also presented in this case). *See, e.g.*, *Cnty. Court of Ulster Cnty., N.Y. v. Allen*, 442 U.S. 140, 164 (1979) (noting that "it is surely rational to infer" from the fact that the defendants were in a car which contained guns "that each [defendant] was fully aware of the presence of the guns and had both the ability and the intent to exercise dominion and control over" them).

Further, Hunt has not "controverted" this evidence, as he must to show that he suffered prejudice from the *Apprendi* error. *See Zepeda-Martinez*, 470 F.3d at 913. Nor could he. Hunt admits that he ordered the package and picked it up knowing it contained a controlled substance, but he would have the Court believe that he did not know *which* controlled substance he ordered and picked up. Surely it can be presumed, however, that drug dealers are not in the habit of giving each other more than they bargained for. It would therefore be absurd to suggest that Hunt —notwithstanding his confession to a "package of 1 Kilo of coke"—actually ordered a far less valuable illegal drug, such as marijuana, but the sender just decided (on his own) to mail cocaine instead, without informing Hunt or asking to be paid for the drug upgrade.

Moreover, if Hunt attempted to offer such an outlandish defense at trial, the government would likely be able to introduce Hunt's string of drug convictions in order to show that Hunt was an experienced drug dealer who would have made a point to know exactly what drug he was receiving. *See United States v. Vo*, 413 F.3d 1010, 1018-19 (9th Cir. 2005) (holding that the defendant's prior drug conviction could be admitted to rebut his claim that he had no knowledge that a package he shipped contained methamphetamine because the "conviction tended to show that [he] was familiar with distribution of illegal drugs and that his actions in this case were not an accident or a mistake"); *United States v. Howell*, 231 F.3d 615, 628 (9th Cir. 2000) (holding that defendant's "prior convictions for possession . . . with intent to deliver cocaine [were admissible] to show that [the defendant] knew that the substance in the bag was a narcotic").

In sum, the only possible defense that is available to Hunt —that he received a free upgrade from marijuana to cocaine —is not one that "could rationally lead to a contrary finding with respect to the omitted element." *Neder*, 527 U.S. at 19. Indeed, the majority has not offered a single theory that a

defense counsel could possibly have argued to a jury in summation. Accordingly, there can be no reasonable doubt that, absent the *Apprendi* error, the result—Hunt's conviction for attempted possession of cocaine with the intent to distribute it—would have been the same.

### B

The majority makes three efforts to avoid this conclusion, none of which withstand even passing scrutiny. First, the majority asserts that "Hunt's denial of his intent in this case" —which is unaccompanied by any explanation of how he accidentally came into possession of a kilogram of cocaine— meets the requirement that the defendant show " 'evidence sufficient to support a contrary finding' " on the omitted element. Maj. Op. at 16664 (quoting *Neder*, 527 U.S. at 19). This, the majority explains, is because such testimony, "if credited, would raise a reasonable doubt as to his intent." *Id.* But evidence is sufficient to support a contrary finding only if it "could rationally lead to a contrary finding." *Neder*, 527 U.S. at 19. Thus, we must ask whether a rational jury could credit Hunt's denial of intent to posses cocaine. The majority refuses to ask that question, stating instead that it "cannot conclude beyond a reasonable doubt that a rational jury would not find Hunt credible, especially where Hunt has never had the opportunity to testify," notwithstanding his conscious choice to plead guilty and to waive trial. Maj. Op. at 16665.

This passage ignores the requirement that a defendant must both "contest[ ] the omitted element *and* raise[ ] evidence sufficient to support a contrary finding." *Neder*, 527 U.S. at 19 (emphasis added); *see also id.* (requiring the defendant to "bring forth facts contesting the omitted element"). Instead, the majority allows a defendant to meet his *Neder* obligation based on the mere possibility that whatever he would have said at trial might have been credible.[2]

---

[2]The majority is also impressed by Hunt's claim that he confessed only because that is what the police "wanted to hear." Maj. Op. at 16664. But

Next, the majority notes that "the contested fact in this case is Hunt's intent, a fact that is not subject to easy proof like the date of prior removal in *Zepeda-Martinez*, a fact which was proved through uncontroverted documentary evidence." Maj. Op. at 16663. The implication is that harmless error analysis should be limited to cases where the error concerned an easily provable element. But this is inconsistent with Supreme Court cases which have "repeatedly recognized that the commission of a constitutional error at trial alone does not entitle a defendant to automatic reversal," *Washington v. Recuenco*, 548 U.S. 212, 218 (2006), even where the defendant is deprived of a jury finding on an element, such as intent, which is not easily provable. *See, e.g.*, *California v. Roy*, 519 U.S. 2, 5 (1996) (per curiam) (holding that the failure to instruct the jury that it must find intent to kill in order to convict the defendant of aiding and abetting murder was subject to harmless error analysis); *Carella v. California*, 491 U.S. 263, 266-67 (1989) (holding that an instruction that foreclosed independent jury consideration of whether the defendant intended to commit theft was subject to harmless error analysis).

Finally, the majority relies heavily on *United States v. Jordan*, 291 F.3d 1091 (9th Cir. 2002), which held that an *Apprendi* error will not be deemed harmless when a necessary element "is neither charged in the indictment nor proved to a

_____

simply attacking one piece of evidence (the confession) with one of the most common means by which confessions are challenged (by claiming that the confessor was just seeking to please his interrogators) is not sufficient evidence to support a contrary finding. *Compare United States v. Nordby*, 225 F.3d 1053, 1060-61 (9th Cir. 2000), *overruled on other grounds by United States v. Buckland*, 289 F.3d 558 (9th Cir. 2002) (concluding that the defendant brought forth evidence sufficient to support a contrary finding on the quantity of marijuana grown on his land by demonstrating that he "had been vacationing for much of the time that the marijuana crop had been in the ground, and only returned to the area five days before being arrested").

jury beyond reasonable doubt." *Id.* at 1097. But *Jordan*'s exception to harmless error analysis does not apply here because the type of drug Hunt intended to possess was charged in the indictment.

## III

Near the end of its opinion, it becomes clear that the majority is not really applying harmless error analysis at all. Indeed, the majority refuses to discuss the strength of the evidence in this case. Instead, it declines to find this *Apprendi* error harmless for reasons that would apply to any case in which there is an *Apprendi* error, thereby effectively eliminating harmless error review in such case.

## A

The majority reasons that "the plea and sentencing proceedings in this case provide an inadequate record because Hunt's intent regarding drug type was never litigated." Maj. Op. at 16666. The majority correctly explains that harmless error review "requires us to 'determin[e] what evidence the parties would have introduced at trial' had the issue been properly presented.' " *Id.* (quoting *Zepeda-Martinez*, 470 F.3d at 913 n.3). But it objects that, "[o]n the record before us, it is speculative at best to predict what evidence the parties would have presented at trial," and thus refuses "to speculate on how a hypothetical trial may have unfolded." *Id.*

These objections would apply to almost every appeal in which there is an *Apprendi* error since, in such cases, the omitted element will almost never have been litigated. Thus, under the precedent established today, a defendant asserting *Apprendi* error can avoid harmless error analysis simply by pointing out that he did not have the opportunity to litigate the omitted element. Similarly, it is *always* "speculative" to "determin[e] what evidence the parties *would* have introduced at trial *had* the issue been properly presented." *Zepeda-*

*Martinez*, 470 F.3d at 913 n.3 (emphasis added) (internal quotation marks omitted); *cf.* Bryan A. Garner, *Modern American Usage* 780 (3rd ed. 2009) (stating that the subjunctive mood is most commonly used to express states of irreality such as "conditions contrary to fact"). Therefore, while the majority may be uncomfortable engaging in a counterfactual inquiry, we are under explicit instructions from our precedents to conduct just such an inquiry.[3]

B

The Supreme Court made precisely these points in *Neder* when it held that the failure to submit an element of a crime to the jury is subject to harmless-error analysis. There, the defendant argued that "[t]o rely on overwhelming record evidence of guilt [that] the jury did not actually consider . . . would be to dispense with trial by jury and allow judges to direct a guilty verdict." *Neder*, 527 U.S. at 17 (emphasis omitted). The *Neder* Court explicitly rejected this argument, noting that "[t]he erroneous admission of evidence in violation of the Fifth Amendment's guarantee against self-incrimination and the erroneous exclusion of evidence in violation of the right to confront witnesses guaranteed by the Sixth Amendment are both subject to harmless-error analysis," even though such errors, like *Apprendi* errors, "infringe upon the jury's factfinding role" in ways that are "not readily calculable." *Id.* at 18 (internal quotation marks omitted).

---

[3]Put another way, the majority's objection is either that "Hunt's intent regarding drug type was never litigated," or that it was never litigated in front of a jury. If it is the latter, then this is the end of harmless error review of *Apprendi* violations in the Ninth Circuit since such violations only occur where an element of a crime is not "submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490. If it is the former, that is, if the majority only objects that the record of Hunt's intent was not sufficiently developed during the sentencing proceedings, then the proper remedy (contrary to its holding) would be to remand so that the district court can hold a hearing and make a factual finding on whether Hunt intended to possess cocaine.

The defendant in *Neder* likewise insisted that, without "an actual verdict of guilty-beyond-a-reasonable-doubt, . . . the basis for harmless-error review is simply absent," requiring the court to speculate about how a hypothetical trial may have unfolded. *Id.* at 11 (internal quotation marks omitted). But, again, the Court deemed this concern inconsistent with its cases which have repeatedly applied harmless error review even "where the jury did not render a 'complete verdict' on every element of the offense." *Id.* at 13; *see also Recuenco*, 548 U.S. at 221 (rejecting the argument that applying harmless error analysis to an *Apprendi* error would require appellate courts to "hypothesize a guilty verdict that was never in fact rendered" (internal quotation marks omitted)).

If there is one way *Apprendi* errors differ from other errors to which harmless error analysis applies, it is this: where a sentence is reversed under *Apprendi*, the government does not have the opportunity to retry the defendant. Accordingly, *Apprendi* errors often result in convicted criminals receiving windfall sentence reductions. This case exemplifies such windfalls: Hunt's fifteen-year sentence—imposed chiefly because of his staggering criminal history—is effectively reduced to one year, or, more realistically, to time served.

C

The majority goes on to undermine harmless error review even further by espousing views of the judicial role that are inconsistent with the explicit limits that Congress has placed on appellate review of criminal sentences.

First, the majority categorically proclaims that "[o]ur responsibility is to see that constitutional requirements are met." Maj. Op. at 16668. Congress, however, has directed federal courts reviewing criminal convictions to "give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties." 28 U.S.C. § 2111. This rule, as well as the Fed-

eral Rules of Criminal Procedure, requires that we " 'disregard[ ]' errors that are harmless beyond a reasonable doubt." *Neder*, 527 U.S. at 7 (quoting Fed. R. Crim. P. 52(a)). Since Congress need not provide criminal defendants with any appellate remedy whatsoever, *see Abney v. United States*, 431 U.S. 651, 656 (1977), it is certainly within its power to limit appellate remedies to legal errors that likely affected the result of the proceeding in the trial court. Therefore, we do not have an unqualified "responsibility . . . to see that constitutional requirements are met." Maj. Op. at 16668. To the contrary, we have an explicit statutory responsibility to "give judgement . . . without regard to [harmless] errors." 28 U.S.C. § 2111. This includes *Apprendi* errors. *Recuenco*, 548 U.S. at 222.

Second, the majority insists that an *Apprendi* error is never a "technicality," and that "[a]voiding what the dissent calls a 'windfall' sentence reduction due to an *Apprendi* error is achieved through a court's faithful compliance with constitutional requirements, not through appellate review." Maj. Op. at 16668. This ignores the fact that the Supreme Court has applied harmless error review to *Apprendi* claims and has repeatedly stated that the harmless error doctrine " 'serve[s] a very useful purpose insofar as it blocks setting aside convictions for small errors or defects that have little, if any, likelihood of having changed the result of the trial.' " *Neder*, 527 U.S. at 19 (quoting *Chapman v. California*, 386 U.S. 18, 22 (1967)). Indeed, avoiding a windfall sentence reduction based on a "small error" (or "technicality," if you will) is the very purpose of the harmless error doctrine. *See Shinseki v. Sanders*, 129 S.Ct. 1696, 1705 (2009) ("The federal 'harmless-error' statute . . . seeks to prevent appellate courts from becoming 'impregnable citadels of technicality.' " (quoting *Kotteakos v. United States*, 328 U.S. 750, 759 (1946))). So, while the majority is correct that such windfalls are ideally avoided "through a court's faithful compliance with constitutional requirements," faithful compliance with statutory

requirements mandates that windfalls must also be avoided "through appellate review." Maj. Op. at 16668.

Last, the majority maintains that "[a] sentence cannot be 'richly deserved' under our Constitution if the facts supporting the sentence have not been proven as constitutionally required." *Id.* at 16667. Yet Congress, under its constitutional power to regulate the federal courts, has directed us to "give judgment . . . without regard to [harmless] errors," 28 U.S.C. § 2111, thereby establishing that a conviction and sentence may still be warranted even if a constitutionally required procedure was not scrupulously followed. *Cf. Kotteakos*, 328 U.S. at 759 (stating that Congress passed the harmless error rule to prevent criminal trials from becoming "a game"). "The harmless error doctrine" thus " 'recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence.' " *Neder*, 527 U.S. at 19 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986)); *cf.* Akhil Reed Amar, *Sixth Amendment First Principles*, 84 Geo. L.J. 641, 642 (1996) (arguing that "[t]he deep principles underlying the Sixth Amendment," and "constitutional criminal procedure generally," are "the protection of innocence and the pursuit of truth"). The majority ignores this principle by vacating Hunt's sentence despite overwhelming evidence that he committed each of the elements necessary to support it.

IV

The Supreme Court has warned that setting the harmless error standard "so high that it could never be surmounted would justify the very criticism that spawned the harmless-error doctrine in the first place." *Id.* at 18. That criticism is that " '[r]eversal for error, regardless of its effect on the judgment, encourages litigants to abuse the judicial process and bestirs the public to ridicule it.' " *Id.* (quoting R. Traynor, *The Riddle of Harmless Error* 50 (1970)).

The *Neder* Court could have been talking about this case. Today, a defendant who has consistently evaded responsibility for his criminal conduct is once again rewarded for his labors. And today, the public sees a criminal who has shown nothing but cruelty to his fellow citizens and contempt for the law escape a richly deserved sentence based on an irrelevant technicality.

I respectfully dissent.